IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ESSENDANT CO., an Illinois Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | No. 18 C 3420 |
| v. | ) ) | Judge Bucklo |
| AMERICAN PRODUCT DISTRIBUTORS, INC., a North Carolina Corporation, C. RAY KENNEDY, an individual, and CYNTHIA KENNEDY, an individual, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Essendant Co. ("Essendant") brings this suit for breach of contract against defendants American Product Distributors, Inc. ("APD"); APD's owner, C. Ray Kennedy ("Ray"); and Ray's spouse, Cynthia Kennedy ("Cynthia") (Ray and Cynthia together, "the Kennedys"). The complaint alleges that APD failed to pay for roughly $2 million worth of items that it ordered from Essendant. In addition, Essendant alleges that the Kennedys, who guaranteed payment of APD's debt, have likewise failed to pay any of the outstanding amount. Before me is Essendant's motion for summary judgment. For the reasons discussed below, the motion is granted.

I.

The relevant facts of the case are simple and undisputed. Essendant is a national wholesale distributor of office products. APD is a reseller. In March 2016, after many years of doing business with APD, Essendant asked the Kennedys to execute a Guaranty according to which they agreed to pay any debts incurred by APD at that time or in the future. In exchange, Essendant agreed to continue selling products to APD. Both Ray and Cynthia signed the Guaranty.

APD continued to submit electronic purchase orders through Essendant's online ordering system until April 2018, at which time APD went out of business. However, APD had stopped making payments in December 2017. At that time, Essendant wrote the Kennedys seeking payment of the past due amount in accordance with the Guaranty. According to Essendant, APD currently owes a total of $1,980,912.36. To date, the Kennedys have made no payments.

In May 2018, Essendant filed a two-count complaint alleging separate claims for breach of contract against APD and the Kennedys. Essendant's motion for summary judgment seeks entry of a judgment against both APD and the Kennedys in the amount of $1,980,912.36, plus prejudgment interest. The defendants oppose the motion on three grounds: (1) Cynthia Kennedy argues that the court lacks personal jurisdiction over her; (2) APD contends that Essendant has failed to prove the existence of a contract between the parties; and (3) the Kennedys claim that the Guaranty is invalid.

II.

Summary judgment is proper where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[W]hen the basic facts are not in dispute, the existence of a contract is a

question of law. Issues of contract formation are therefore particularly well-suited for disposition on summary judgment." *Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1102 (7th Cir. 1997) (citations omitted).

I apply Illinois law in deciding the substantive issues raised in Essendant's motion. The Guaranty contains a choice-of-law clause which provides that it "will be construed in accordance with the internal laws of the State of Illinois." Guaranty ¶ 10. Of course, relying on the choice-of-law clause might seem problematic in this case because that clause may not be applicable if the Guaranty itself is unenforceable, and the Guaranty's enforceability is one of the matters in dispute. *See, e.g.*, *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 357 (7th Cir. 2015) ("A contract's choice-of-law provision may not apply if the contract's legality is fairly in doubt, for example, if the contract is unconscionable, or if there is some other issue as to the validity of the very formation of the contract."). However, since neither party has raised a choice-of-law issue, and since both parties assume that Illinois law supplies the rule of decision, I apply Illinois law without the need for a choice-of-law analysis. *See, e.g.*, *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426–27 (7th Cir. 1991) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies. We are busy enough without creating issues that are unlikely to affect the outcome of the case (if they were likely to affect the outcome the parties would be likely to contest them)."); *see also RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008) ("When neither party raises

a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits.").[1]

As noted above, in addition to disputing the merits of Essendant's claims, the defendants challenge the court's exercise of personal jurisdiction over Cynthia Kennedy. As a general matter, jurisdictional issues must be addressed prior to addressing the merits of a dispute. *See, e.g.*, *Weisskopf v. Marcus*, 695 F. App'x 977, 978 (7th Cir. 2017) ("Like subject-matter jurisdiction, personal jurisdiction must be addressed and resolved ahead of substantive issues."). It is not entirely clear whether this rule applies in this case, since it will be necessary to address the merits of Essendant's claims against APD and Ray Kennedy regardless of whether personal jurisdiction exists over Cynthia. Nevertheless, in the absence of any Seventh Circuit case directly on point, I follow the traditional order of deciding jurisdictional issues first. Accordingly, I begin by examining the question of whether personal jurisdiction exists

---

[1] Because the transactions between APD and Essendant were for the sale of goods, Essendant's claim against APD is governed by Illinois' Uniform Commercial Code. *See, e.g.*, *Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 615 (Ill. 2006) ("In Illinois, the sale of goods is governed by article 2 of the Uniform Commercial Code.") (citing 810 ILCS 5/1– 101 *et seq*.). The Guaranty, however, is not a contract for the sale of goods and thus would appear to be governed by Illinois common law. *See, e.g.*, *M.S. Distrib. Co. v. Web Records, Inc.*, No. 00 C 1436, 2003 WL 21788988, at *5 (N.D. Ill. July 31, 2003) ("We do not agree that the guaranty is covered by the U.C.C.... [The fact that the underlying distributing agreement was controlled by the U.C.C.] does not answer the specific question of whether the guaranty, which is not itself a transaction in goods or services but is a guaranty of repayment of certain funds expended in connection with a transaction in goods or services, also is controlled by the U C.C.... [T]he few cases from other jurisdictions we have found that address the issue have held that guarantees are not controlled by the U.C.C."). Thus, in what follows, I apply the Illinois U.C.C. in deciding the merits of Essendant's claim against APD and Illinois common law in deciding the merits of Essendant's claim against the Kennedys. Ultimately, however, the outcome would be the same for both claims under either body of law.

over Cynthia and then turn to the substantive issues raised by Essendant's claims against APD and the Kennedys.

## A.     Personal Jurisdiction Over Cynthia Kennedy

Typically, the issue of personal jurisdiction turns on whether a party has "minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (*Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Essendant, however, appears to concede that Cynthia's contacts with Illinois are insufficient to meet this standard. Instead, Essendant asserts that personal jurisdiction over Cynthia is proper on two alternative grounds: (1) that Cynthia has waived any objection vis-à-vis personal jurisdiction by virtue of her participation in the litigation thus far; and (2) that Cynthia has consented to the court's exercise of personal jurisdiction over her by virtue of the Guaranty's forum-selection clause. I discuss these arguments in turn.

### 1.     Waiver

As Essendant acknowledges, Cynthia asserted lack of personal jurisdiction as an affirmative defense in her answer to the complaint. *See* Defs.' Answer at 9. Nevertheless, Essendant claims that Cynthia has waived the defense due to her subsequent participation in the litigation. Specifically, Essendant points out that Cynthia filed a joint Rule 26(f) Initial Planning Report and two joint motions to extend the deadline for production of documents, *see* ECF Nos. 13*,* 15 & 18; and that her counsel appeared in court in January 2019, at which time an agreement was reached to extend the deadline for filing dispositive motions.

While a party may waive a personal-jurisdiction defense by participating in a lawsuit, the Seventh Circuit has explained that waiver occurs only when the party's participation "give[s] a plaintiff a reasonable expectation that it will defend the suit on the merits," or where the participation causes "the court to go to some effort that would be wasted if personal jurisdiction is later found lacking." *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010).

Neither of these conditions is met here. The motions and court appearance cited by Essendant were of a purely preliminary nature. They did not address substantive matters and could not have led Essendant reasonably to expect that Cynthia intended to litigate the case on the merits. *See, e.g.*, *Swanson v. City of Hammond, Ind.*, 411 F. App'x 913, 915–16 (7th Cir. 2011) ("Preliminary litigation actions, such as the defendants' request for an extension of time to file their responsive pleading, do not waive or forfeit personal-jurisdiction defenses."). Similarly, Cynthia's participation in the litigation has not required any unnecessary work on the court's part. The previous motions in which Cynthia was involved were filed jointly with the other defendants in the case. As a result, it would have been necessary to decide the motions regardless of Cynthia's participation in the suit.

In short, Cynthia has not waived her objection to personal jurisdiction based on her participation in the suit.

## 2. The Forum-Selection Clause

Somewhat more complicated is the question of whether Cynthia is subject to personal jurisdiction in this court on account of the Guaranty's forum-selection clause. The provision states:

> ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS GUARANTY WILL BE LITIGATED IN COURTS HAVING SITUS WITHIN THE STATE OF ILLINOIS OR IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, OR, AT CREDITOR'S SOLE OPTION, IN ANY OTHER COURT IN WHICH CREDITOR SHALL INITIATE LEGAL OR EQUITABLE PROCEEDINGS AND WHICH HAS SUBJECT MATTER JURISDICTION OVER THE MATTER IN CONTROVERSY. THE UNDERSIGNED HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF SUCH COURTS FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE.

Guaranty ¶ 11.[2]

Cynthia does not dispute that the clause's plain language indicates that she and her husband have consented to the jurisdiction of Illinois courts. Nor does Cynthia dispute that, even in the absence of sufficient minimum contacts, a forum-selection clause alone is sufficient to confer personal jurisdiction over a party. *See, e.g.*, *TruServ Corp. v. Flegles, Inc.*, 419 F.3d 584, 589 (7th Cir. 2005) ("'Obviously, a valid forum-selection clause, even standing alone, can confer personal jurisdiction.'") (alteration omitted) (quoting *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1292 n. 4 (7th Cir. 1989)). Cynthia instead advances several arguments in an attempt to show that

---

[2] Of course, like the choice-of-law clause, the Guaranty's forum-selection clause may not be enforceable if the Guaranty itself is not enforceable. *See, e.g.*, *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 357 (7th Cir. 2015). However, because I must address the issue of personal jurisdiction before addressing the Guaranty's enforceability, I shall assume for purposes of this discussion that the Guaranty is enforceable. I take up the merits of the issue in Section C, *infra*.

the forum-selection clause is unenforceable against her. None of these arguments

carries the day.

### (a)  The Reasonableness of the Forum-Selection Clause

Cynthia first argues that under Illinois law, enforcing the forum-selection clause

against her would be unreasonable.[3] "In Illinois ... a forum-selection clause in a contract

is *prima facie* valid, and should be enforced unless the opposing party shows that

enforcement would be unreasonable under the circumstances such that the selected

forum will be so gravely difficult and inconvenient that [the opposing party] will for all

practical purposes be deprived of [its] day in court." *Patrick v. Allstate Ins. Co.*, 2018 IL

---

[3] While most circuits have held that the enforceability of forum-selection clauses is a matter of federal procedure and should therefore be decided under federal law, the Seventh Circuit has held that, "[i]n contracts containing a choice of law clause ... the law designated in the choice of law clause [is] used to determine the validity of the forum selection clause." *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 775 (7th Cir. 2014) (citing *Abbott Laboratories v. Takeda Pharmaceutical Co.*, 476 F.3d 421, 423 (7th Cir. 2007)); *IFC Credit Corp. v. United Bus. & Indus. Fed. Credit Union*, 512 F.3d 989, 991 (7th Cir. 2008) ("[T]he validity of a forum-selection clause depends on the law of the jurisdiction whose rules will govern the rest of the dispute."). Here, the Guaranty provides that it "will be construed in accordance with the internal laws of the State of Illinois." Guaranty ¶ 10. Hence, Illinois law governs the forum-selection clause's validity and enforceability.

The parties exhibit some uncertainty on this point and both end up addressing the forum-selection clause's enforceability under both Illinois and federal law. Even if the issue were unsettled, however, it would be unnecessary for me separately to consider the forum-selection clause's enforceability under federal law. This is because, as the Seventh Circuit has observed, Illinois law is more favorable than federal law to parties challenging the enforceability of forum-selection clauses. *See, e.g.*, *IFC Credit Corp. v. Aliano Bros. Gen. Contractors*, 437 F.3d 606, 611–12 (7th Cir. 2006) ("At the black-letter level, Illinois law concerning the validity of forum selection clauses is materially the same as federal law.... But in application ... the Illinois law on validity is more lenient toward the defendant than the federal law when there is a significant inequality of size or commercial sophistication between the parties."). Thus, because I conclude that the forum-selection clause is enforceable under Illinois law, it follows *a fortiori* that the clause is enforceable under federal law. *See, e.g.*, *Macey & Aleman v. Simmons*, No. 10-CV-06646, 2011 WL 1456762, at *2 n.2 (N.D. Ill. Apr. 14, 2011) (stating that "if the forum selection clause is valid under Illinois law, then it is also valid under federal law").

App (1st) 17-1301-U, ¶ 24 (quotation marks omitted). In particular, Illinois courts have enumerated six factors to be taken into account in determining whether enforcement of a forum-selection clause is unreasonable: "(1) the law that governs the formation and construction of the contract; (2) the residency of the parties; (3) the place of execution and/or performance of the contract; (4) the location of the parties and their witnesses; (5) the inconvenience to the parties of any particular location; and (6) whether the clause was equally bargained for." *GPS USA, Inc. v. Performance Powdercoating*, 26 N.E.3d 574, 583 (Ill. App. Ct. 2015) (quoting *IFC Credit Corp. v. Rieker Shoe Corp.*, 881 N.E.2d 382, 389-90 (Ill. App. Ct. 2007)).

Notably, since the burden is on the party challenging the forum-selection clause, factors that are merely neutral in this calculus ultimately weigh in favor of a clause's enforcement. *See, e.g.*, *Exhibit Sys., Inc. v. Pico Art Int'l Pte., Ltd*., No. 15 C 2930, 2015 WL 3930265, at *2 (N.D. Ill. June 25, 2015) ("Because the defendant has the burden of showing that the choice of forum is unreasonable, 'any factor that is even neutral on the forum question essentially weighs in favor of the forum choice.'") (quoting *GPS USA*, 26 N.E.3d at 584); *see also Navman Wireless N. Am., Ltd. v. Texas Oilfield Servs., LLC*, No. 16 C 11356, 2017 WL 1199751, at *2 (N.D. Ill. Mar. 30, 2017) (parties' residence favored enforcement of forum-selection clause where not enforcing the clause would merely shift inconvenience from one party to the other). Moreover, courts have held enforcement of forum-selection clauses to be reasonable even when a majority of the relevant factors weigh in favor of the challenger. *See, e.g.*, *Macey & Aleman v. Simmons*, No. 10-CV-06646, 2011 WL 1456762, at *3 (N.D. Ill. Apr. 14, 2011) ("Even if a majority of the factors favor litigation in another forum, this court may still conclude

that the clause is reasonable."); *Dace Int'l, Inc. v. Apple Computer, Inc.*, 655 N.E.2d 974, 977–78 (Ill. App. Ct. 1995) (forum-selection clause was reasonable even though four of the six factors favored the opposing party). Having examined and weighed all of the factors, I conclude that enforcement of the Guaranty's forum-selection clause against Cynthia is not unreasonable.

The first four factors are relatively straightforward. The first factor (governing law) favors Essendant because the Guaranty's choice-of-law provision requires the application of Illinois to disputes arising in connection with the agreement. The second factor (residency) is neutral: Essendant is located in Illinois and Cynthia resides in North Carolina. The third factor (the place of the contract's execution/performance) is ambiguous: the place of the Guaranty's execution is presumably North Carolina, where Cynthia and Ray signed the document; but the place of the Guaranty's performance is unclear. There is very little case authority addressing the question of how to determine the place of a Guaranty's performance, and the authorities that do exist are not uniform.[4] Given that Cynthia has not addressed this factor at all, it arguably weighs in Essendant's favor; but at all events, given the ambiguity in the applicable law, this factor

---

[4] *See, e.g.*, *Am. Hardware Supply Co. v. White Eagle Lumber & Supply, Inc.*, No. 86 C 9799, 1989 WL 57078, at *2 (N.D. Ill. May 17, 1989) ("[P]erformance of the guaranty is arguably not confined to a single state. True, plaintiff extends credit to defendants from Pennsylvania; but defendant White Eagle is an Illinois corporation which receives shipments of merchandise under the purported guaranty in Illinois. The place of performance is splintered."); *Moody v. Kirkpatrick*, 234 F. Supp. 537, 541 (M.D. Tenn. 1964) ("[T]he place of performance of a guaranty contract is generally presumed to be the guarantee's place of residence."); *see also* Jack K. Levin, Guaranty 72 A.L.R.3d 1180 (Originally published in 1976) ("The place of performance of a contract of guaranty depends upon the intention of the parties, and it is usually said that in the absence of a clear intention expressed in the contract of guaranty, it will be presumed that the parties intended the guarantor to perform his obligation in the jurisdiction where the contract was entered into.").

does not favor Cynthia. The same is true of the fourth factor (the location of the parties and witnesses): Essendant states that it would call multiple witnesses, all of whom are located in Illinois. Cynthia, however, does not address this factor, so it is unclear how many witnesses she might call and where they reside. In light of Cynthia's failure to address the issue, the fourth factor again arguably weighs positively in Essendant's favor; at the very least, it does not weigh in Cynthia's favor. In sum, of the first four factors, none weighs against enforcement of the forum-selection clause, and at least one weighs strongly in favor of enforcement.

Whether the final two factors weigh in Cynthia's favor -- and if so, whether they weigh strongly enough in her favor to render the forum-selection clause's enforcement unreasonable -- is a more difficult question. The fifth factor (inconvenience to the parties) favors Cynthia. In her affidavit, she states that having to litigate in Illinois would be particularly inconvenient for her because she is the primary caretaker for her mother, who is ninety-five years old and suffers from dementia. *See* Cynthia Kennedy Aff. ¶ 16. Cynthia also avers that she has her own "complicated health history," stating that she has undergone two knee replacements and has suffered a pulmonary embolism (though the dates of these events are not specified), and that she is under the care of a cardiologist. *Id*. ¶ 17.

While these concerns certainly should not be downplayed, inconvenience alone is not sufficient to render a forum-selection clause unreasonable. *See, e.g.*, *Dace Int'l, Inc. v. Apple Computer, Inc.*, 655 N.E.2d 974, 977–78 (Ill. App. Ct. 1995) ("[R]elative inconvenience has been routinely rejected as a basis for voiding forum selection clauses: 'the question is not the most convenient place for trying these suits; it is

whether the defendants consented to being sued in a particular forum and by doing so waived their right to object to the jurisdiction of the courts over them.'") (quoting *Northwestern Nat'l Ins. Co. v. Donovan*, 916 F.2d 372, 376 (7th Cir. 1990)); *see also Macey & Aleman v. Simmons*, No. 10-CV-06646, 2011 WL 1456762, at \*5 (N.D. Ill. Apr. 14, 2011) ("It goes without saying that litigating a case in one's home state is more convenient for a defendant, but 'mere inconvenience does not provide a basis for voiding a forum selection clause.'") (quoting *IFC Credit Corp.*, 881 N.E.2d at 390).

This is so even when the inconvenience stems from serious health concerns. In *Rosati's Franchising, Inc. v. Fire It Up, LLC*, No. 15 C 2230, 2015 WL 3961703 (N.D. Ill. June 29, 2015), for example, the defendant claimed that having to litigate in Illinois would be inconvenient for him because he was "suffering from serious medical conditions and undergoing kidney dialysis, requiring close medical attention from his doctors in Arizona, making him unable to travel." *Id.* at \*5. Although the court acknowledged these difficulties, it held that having to litigate in Illinois would not "be so inconvenient that enforcement of the forum selection clause would deprive Defendants of their day in court." *Id.* The same holds true here: the problems presented by Cynthia's and her mother's health may make litigating in Illinois inconvenient, but, without more, they are insufficient to make the forum-selection clause unreasonable.

The sixth factor -- whether the forum-selection clause was equally bargained-for -- might initially appear to weigh strongly in Cynthia's favor. There is a clear difference in bargaining power between the parties: Cynthia is an individual and Essendant is a corporation. Moreover, it is undisputed that Cynthia was never an employee, shareholder, or officer of APD and never participated in running the company in any

way. Pl.'s Resp. to Defs.' L.R. 56.1 Stmt. Add'l Fact ¶ 6. Thus, Cynthia cannot be regarded as a sophisticated actor in the realm of business transactions. Further, Cynthia claims that she never communicated with anyone at Essendant regarding the Guaranty's terms and that she "did not have the opportunity to ask questions, make counter-proposals, or engage in any discussions regarding the formation of this agreement." Cynthia Kennedy Aff. ¶ 12. In fact, Cynthia avers that she did not read the Guaranty before signing it. *Id*.

However, the severity of the power differential between APD and Cynthia is mitigated by several facts. First, although Cynthia had no ownership interest in ADP and was not involved in running the company, she did not sign the Guaranty alone. She executed it jointly with her husband, Ray, who had been APD's owner and CEO from its inception in 1998 to his retirement in 2014. In addition, the Guaranty was presented to Cynthia and Ray by their son, Cy Kennedy, who was APD's president from 2011 to 2018. Ray and Cy are not unsophisticated actors. *See, e.g.*, *Rosati's*, 2015 WL 3961703, at *5 (defendants failed to establish unequal bargaining power where they "were sufficiently sophisticated to form [a family-owned business] ... and made representations on online review websites that their family had over thirty years of experience in the pizza business"); *GPS USA*, 26 N.E.3d at 584 (president and co-owner of small "mom and pop company" did not lack "the necessary sophistication to negotiate a more favorable forum" although she averred that she had no representation and "just signed the form contract that was provided for [her]"); *IFC Credit Corp.*, 881 N.E.2d at 394–95 (bargaining power of defendant corporations, which included a self-

employed individual, was not so inferior to power of plaintiff corporation as to make enforcement of forum-selection clause unreasonable).

This is not to say that Ray's or Cy's level of business sophistication can be attributed to Cynthia; nor is it to say, even if Ray's or Cy's level of sophistication could be attributed to Cynthia, that this would entirely negate the disparity in bargaining power between her and Essendant. Nevertheless, in view of Cynthia's relationship with Ray and Cy, this is not a David-and-Goliath scenario involving a lone, helpless consumer and a powerful corporation. On this point, it is relevant that Ray and Cynthia possess considerable financial resources. The Kennedys provided a joint personal financial statement to Essendant when they agreed to serve as guarantors of APD's debts. Among the assets included on the statement are the Kennedys' home and two daycare centers. They list a net worth of roughly $27 million. *See* Pl.'s Ex. 5.

Second, the record does not support Cynthia's claim that she had no opportunity to ask questions or to negotiate with Essendant in connection with the Guaranty. Cynthia does not explain why, or in what sense, she believes these opportunities were unavailable to her. She does not claim, for example, that anyone representing Essendant led her to believe, much less directly told her, that she was not permitted to ask questions or make counter-proposals. Indeed, as noted above, Cynthia states that she never communicated with anyone from Essendant. Nor does Cynthia identify anyone else who led her to believe that she could not ask questions or propose other terms.

In their affidavits, Cy and Ray Kennedy likewise state that the Kennedys had no opportunity to ask questions or to make counter-proposals. *See* Ray Kennedy Aff. ¶ 11;

Cy Kennedy Aff. ¶ 5. Yet they, too, offer no explanation or basis for these statements. With respect to the circumstances surrounding the Guaranty's execution, the only evidence in the record is Cy's testimony that the Guaranty was sent to him via email by Bob Kelderhouse, Essendant's treasurer. *Id*. But Cy offers no details about the substance of his communications with Kelderhouse. Cy does state that he "was led to believe that the [Guaranty] needed to be signed for [APD] to continue to do business with Essendant." Cy Kennedy Aff. ¶ 5. But he does not say that it was Kelderhouse, or anyone else representing Essendant, who led him to believe this. More importantly, even if Essendant had led Cy to believe that the Kennedys needed to execute the Guaranty in order for Essendant to continue doing business with APD, Cy does not say that Essendant led him to believe that the document had to be signed without any questions or negotiation. Nor does Cy suggest that anyone led him to believe that the Guaranty had to be executed *immediately*. Thus, even assuming that Essendant was not amenable to negotiation, nothing in the record suggests that Cynthia and Ray could not at least have sought legal advice before entering into the agreement.

Absent any evidence that Essendant denied Cynthia an opportunity to ask questions or make counterproposals, her failure to do so cannot be blamed on Essendant. *See, e.g.*, *Capitol Cement Co. v. CMI Terex Corp.*, No. 12 C 5984, 2012 WL 13042075, at *3 (N.D. Ill. Sept. 26, 2012) ("Capitol states that it was 'forced to agree to these terms,' and that it did not have the opportunity to bargain or negotiate, but Capitol has failed to provide any real facts to support its argument.... Instead, the court is provided an affidavit from Capitol's President ... stat[ing] that Capitol was not given the opportunity to negotiate. This bald statement tells the court nothing about the

circumstances surrounding the contract's formation."); *GPS USA,* 26 N.E.3d at 584 ("In her affidavit, Presley averred that no representative of respondent negotiated the terms of the Agreement, but rather Presley 'just signed the form contract that was provided for [her].' A failure to negotiate, however, does not equate to an inability to do so.").

Essendant also cannot be blamed for Cynthia's failure to read the document or to seek legal advice before signing it. *See, e.g.*, *Glazer v. Quebecor World, Inc.*, No. 05 C 4501, 2006 WL 335791, at *6 (N.D. Ill. Feb. 13, 2006) ("Furthermore, that Glazer did not read the contract carefully and 'did not notice' the forum selection clause is not a basis to deny enforcement of the clause. '[A] party to a contract has an obligation to read its provisions. It is a fundamental principle of contract law that a person who signs a contract is presumed to know its terms and consents to be bound by them.'") (quoting *Bonny v. Society of Lloyd's*, 3 F.3d 156, 160 n. 10 (7th Cir. 1993)); *Geldermann, Inc. v. Smith*, No. 86 C 5785, 1987 WL 8185, at *2 (N.D. Ill. Mar. 19, 1987) ("Smith was sent a two page contract into which he entered freely. Smith's failure to read the provision, discuss or negotiate its terms, or have someone explain it to him does not constitute improper conduct on the part of Geldermann. Smith's contention that the forum-selection clause is voidable because of his lack of sophistication is unavailing. If Smith was truly unable to understand the ramifications of the forum-selection provision, he could have contacted an attorney to review the contract prior to signing.") (Rovner, J.).

Several additional facts further diminish the significance of the disparity in bargaining power between Cynthia and Essendant. For one thing, courts have emphasized that a consumer's lack of sophistication is particularly relevant where "the transaction is so small that the unsophisticated party might not be expected to be

careful about reading boilerplate provisions that would come into play only in the event of a lawsuit, normally a remote possibility." *IFC Credit Corp. v. Aliano Bros. Gen. Contractors*, 437 F.3d 606, 611–12 (7th Cir. 2006); *see also Advance Steel Erection, Inc. v. Design Data Corp.*, 2012 IL App (1st) 111977-U, ¶ 38 (forum-selection clause was reasonable where, among other things, the defendant was not "akin to an ordinary consumer involved in a small transaction with a sophisticated office business entity"). Execution of the Guaranty was not a small transaction. Cynthia's and Ray's obligations under the agreement are absolute and unconditional; and given the volume of business between APD and Essendant, agreeing to guarantee APD's debts entailed a significant financial commitment. This is not a case, in other words, in which Cynthia might have been expected to sign the Guaranty without carefully reviewing its provisions.

Second, while the forum-selection clause might be characterized as "boilerplate" -- in the sense that it includes "[r]eady-made or all-purpose language that will fit in a variety of documents," Black's Law Dictionary (11th ed. 2019) -- the clause lacks many of the characteristics that traditionally have made boilerplate provisions particularly objectionable. For example, the forum-selection clause is written in plain language, not complex "legalese"; and it is written in all capital letters, not hidden in fine print. *See, e.g.*, *Derrick v. Frank Found. Child Assistance Int'l, Inc.*, No. 03 C 5737, 2004 WL 1197249, at *2 (N.D. Ill. May 28, 2004) ("The paragraph is isolated near the top of the page and there is a blank line before and after the paragraph. The paragraph is straightforward and does not contain legal language that would confuse an average layperson."); *IFC Credit*, 881 N.E.2d at 390–91 (holding that the sixth reasonableness factor did not favor the defendant, because, *inter alia*, while "the forum selection clause

was boilerplate language in the preprinted agreement and the parties did not engage in any negotiation over those terms, ... the clause was not hidden in the contract simply because it was in small print on the back of the agreement").

Thus, while the sixth factor weighs in Cynthia's favor, it does so only partially. The forum-selection clause may not have been the result of equal bargaining power, but Cynthia has not shown that the disparity in power between her and Essendant is so great as to make enforcement of the forum-selection clause unreasonable. There is no evidence that Essendant refused to negotiate with Cynthia. And while Cynthia's lack of sophistication may have impeded her from trying to bargain with Essendant, this is mitigated by Ray's and Cy's involvement in the transaction, both of whom have significant business experience. Cynthia's lack of sophistication is additionally offset by the fact that, given the magnitude of the transaction, she cannot be presumed to have entered into the agreement without careful consideration, and the fact that she had the means to obtain legal representation.

The upshot of the foregoing discussion is that only two of the six factors weigh in Cynthia's favor; and of these, one factor (the sixth) favors her only to a limited degree. Taking all of the factors into consideration, I am not persuaded that enforcing the forum-selection clause would effectively deprive her of her day in court. Accordingly, I conclude that enforcement of the Guaranty's forum-selection clause is not unreasonable.

### (b)     Public Policy

Cynthia next contends that the Guaranty's forum-selection clause should not be enforced because it violates public policy. According to Cynthia, this is because, by

filing suit in Illinois, Essendant has failed to comply with Illinois' general venue statute, which provides that "[e]xcept as otherwise provided in this Act, every action must be commenced (1) in the county of residence of any defendant who is joined in good faith ..., or (2) in the county in which the transaction or some part thereof occurred out of which the cause of action arose." 735 ILCS 5/2-101. As Cynthia reads it, the statute required Essendant to file suit either in Mecklenburg County, North Carolina, where she resides, or in Cabarrus County, North Carolina, where the Guaranty was signed. "Given that the forum selection clause seeks to override the wisdom of the Illinois legislature," she maintains, "it is a contravention of the policy underlying the general venue statute." Defs.' Resp. Br. at 10 (quotation marks omitted).

As an initial matter, this argument appears to rest on a misreading of the venue statute. The provision on which Cynthia relies applies where at least one of the defendants is an Illinois resident. The statute goes on to state that where "all defendants are nonresidents of the State, an action may be commenced in any county." 735 ILCS 5/2-101; *Kerry No. 5, LLC v. Barbella Grp., LLC*, 973 N.E.2d 913, 921 (Ill. App. Ct. 2012) (because sole defendant was a non-resident of Illinois, "an action [could] be filed against it in any county in Illinois according to section 2–101 of the Code"). Thus, because Cynthia and the other defendants are not Illinois residents, venue was proper in any Illinois county. The forum-selection clause therefore does not conflict with Illinois' venue statute and does not violate public policy.

Even on its own terms, however, Cynthia's argument is unconvincing. The case on which she principally relies, *Williams v. Illinois State Scholarship Comm'n*, 563 N.E.2d 465 (Ill. 1990), does not support her position. *Williams* involved a class action

suit by individuals who had defaulted on Illinois Guaranteed Student Loans. The plaintiffs sought to enjoin the defendants from bringing collection actions in Cook County, notwithstanding a forum-selection clause in the loan documents waiving any objection on this point. *Id*. at 469. The Illinois Supreme Court held that the clause was unenforceable because it resulted in "the contravention of the policy underlying the general venue statute, ridiculous long-distance forum abuse, and the unfair burdening of a forum not connected to the litigation." *Id*. at 486.

The Guaranty's forum-selection clause does not run afoul of these policy concerns. Cynthia has offered no reason for believing that Essendant has attempted to use the forum-selection clause in an abusive manner. Nothing in the record suggests that Essendant has attempted to disadvantage Cynthia by bringing suit in Illinois. She is, after all, only one of three defendants in the case, and there is no dispute that personal jurisdiction and venue in Illinois are proper as to the other two. Likewise, filing this suit in Illinois does not result in "the unfair burdening of a forum not connected to the litigation." *Id*. at 486. The present suit does not lack a connection to Illinois. Essendant is headquartered in Illinois; the Guaranty was delivered in Illinois, *see* Guaranty ¶ 10; and the underlying transactions between APD and Essendant were at least partly performed in Illinois.[5]

---

[5] Further, in addition to holding that the forum-selection clause conflicted with the policies underlying the venue statute, *Williams* concluded that the clause was unreasonable under the traditional six-factor test discussed above. 563 N.E.2d at 487; and, in the course of its analysis, the court held that the loan agreements amounted to contracts of adhesion. For reasons already discussed, these additional considerations are not present here.

For these reasons, Cynthia has failed to demonstrate that enforcing the forum-selection clause would violate Illinois public policy.

### (c) The Forum-Selection Clause's Specificity

Cynthia's final contention is that the forum-selection clause is unenforceable because its terms are not clear and specific. Her argument focuses on the fact that the clause allows Essendant to file suit not only in Illinois but "*at creditor's sole option, in any other court* in which creditor shall initiate legal or equitable proceedings and which has subject matter jurisdiction over the matter in controversy." Defs.' Resp. Br. at 8 (quoting Guaranty ¶ 11). "Under these terms," she maintains, "Essendant would be free to force the Kennedys to travel across the continental United States to defend themselves, should Essendant decide to exercise its 'sole option.'" *Id*. According to Cynthia, "[s]uch language lacks the requisite specificity to be enforceable because it overextends venue to any state chosen by Essendant." *Id*.

In support of the proposition that a forum-selection clause may be unenforceable for lack of specificity, Cynthia cites a single case, *Whirlpool Corp. v. Certain Underwriters at Lloyd's London*, 662 N.E.2d 467 (Ill. App. Ct. 1996). *Whirlpool* involved a "service-of-suit" clause in an insurance contract which provided that, at the request of the insured, the defendant "will submit to the jurisdiction of any Court of competent jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court." *Id*. at 469–70. At issue was whether the defendant was required to litigate the entire suit in Illinois, or whether, after submitting to the jurisdiction of the Illinois courts, the defendant could seek to transfer

the case to another state based on the *forum non conveniens* doctrine. The court adopted the latter position.

The facts and questions presented in *Whirlpool* bear little resemblance to those here. As an initial matter, the forum-selection clause here is more specific than the one in *Whirlpool*. The clause in *Whirlpool* did not identify any particular forum in which the defendant would be required to submit to jurisdiction; here, the Guaranty's forum-selection clause specifies that litigation will be commenced in Illinois, and simply allows Essendant to choose another forum as a secondary option. More importantly, *Whirlpool* did not hold that the clause at issue there was unenforceable on account of its lack of specificity. Indeed, the enforceability of the clause was not contested in the suit. The dispute centered only on how the service-of-suit clause was to be *interpreted* -- i.e., whether the clause required the defendant to litigate in the forum chosen by the plaintiff or whether the defendant could seek a transfer once suit had been filed.[6] In adopting the latter interpretation, the court observed that "[g]ood policy dictates that a true forum selection clause should be clear and specific." *Id*. at 471. The court nowhere suggests that a forum-selection clause is unenforceable if it is not specific.

---

[6] Cynthia argues that the Guaranty is indefinite in other respects as well. For example, she contends that the agreement "does not specifically define or limit on Cynthia's exposure," and that "it does not even identify her obligation," but instead "simply commits her to satisfying 'all indebtedness now due and/or which may hereafter become due to Creditor howsoever created.'" Defs.' Resp. Br. at 8-9 (quoting Guaranty at 1). In addition, she says that the Guaranty "does not identify the time in which Cynthia's performance become [sic] due nor the amount of time she has to perform— other than by saying her performance must be 'prompt.'" *Id*. at 9. These contentions are advanced only in passing and, at any rate, are essentially the same as those asserted by the Kennedys in contesting the enforceability of the Guaranty as a whole. I discuss these arguments in greater detail below, *see* section C, *infra*.

In short, I am unpersuaded by this argument, or any of Cynthia's other arguments, that the Guaranty's forum-selection clause is unenforceable. Accordingly, I conclude that personal jurisdiction over her is proper for purposes of this suit.

## B.   Breach of Contract as to APD

I now turn to the merits of Essendant's breach-of-contract claims, beginning with the claim against APD. Under Illinois law, "[t]he elements of a claim for breach of contract are (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015) (citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)). APD challenges only the first of these elements, arguing that Essendant has failed to demonstrate the existence of a contract between the parties. I disagree.

### 1.   The Best Evidence Rule

APD's chief argument is an evidentiary one: it contends that Essendant has violated the best evidence rule. Codified in Federal Rule of Evidence 1002, the best evidence rule states that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. According to APD, Essendant was required under Rule 1002 to "provide[] to this Court the actual contract between itself and APD or the actual purchase orders." Defs.' Resp. Br. at 14.[7] Instead, APD points out, Essendant has

---

[7] Here, and in certain other places in its brief, APD alludes to the "actual contract" between the parties. In its Local Rule 56.1(b)(3) Statement of Additional Facts, APD similarly refers to a "primary contract" between the parties. *See, e.g.*, Defs.' L.R. 56.1 Stmt. Add'l Fact ¶ 14 ("Cynthia was never informed about the extent of American Product Distributors obligations under the primary contract, including the summaries of

submitted only an affidavit by Anthony Giuliano ("Giuliano"), Essendant's Vice President and Treasurer, along with a copy of Essendant's account ledger reflecting all of APD's outstanding purchases. Thus, APD asserts, Essendant has failed to provide sufficient evidence of a contract between the parties.

APD's argument ignores the fact that Rule 1002 requires the production of original documents only if no other evidentiary rule or federal statute provides otherwise. Here, Essendant correctly contends that its use of the account ledger in lieu of the actual purchase orders is permitted under Federal Rule of Evidence 1006, which provides that a "proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006.[8] The unpaid purchase orders at issue in this case number in the thousands. As Essendant points out, even the account ledger

_____

the purchase orders."). These references suggest the existence of a contract between APD and Essendant beyond the individual purchase orders for the relevant transactions. However, neither APD nor Essendant offers any further information regarding such an additional contract. To the extent that such an additional contract exists, it is not relevant for purposes of this motion, for Essendant makes clear that its breach-of-contract claim against APD is based on the individual purchase orders. *See, e.g.*, Pl.'s Mem. Supp. Summ. J. at 3 ("The purchase orders used by APD in connection with its purchases from Essendant constitute valid, binding agreements."). Hence, in considering APD's best-evidence argument, the question is whether Essendant was required to submit to the court the individual purchase orders for the unpaid items, not whether Essendant was required to submit any additional contract between the parties.

[8] Essendant states that "there are no formal, signed contracts here because, as the parties agree, APD placed its orders on Essendant's electronic system." Pl.'s Reply Br. at 2. However, it does not follow -- and I do not understand Essendant to be arguing -- that APD's best-evidence objection fails because there are no "original writings" for the purposes of Rule 1002. Federal Rule of Evidence 1001 provides that "[f]or electronically stored information, 'original' means any printout -- or other output readable by sight -- if it accurately reflects the information." Fed. R. Evid. 1001(d). Presumably, Essendant could provide such a printout for each of the purchase orders at issue.

summarizing the orders runs to roughly 500 pages. *See* Pl's Ex. 4. Under these circumstances, it would be impracticable for Essendant to submit as evidence each of the purchase orders underlying these transactions. Hence, under Federal Rule of Evidence 1006, Essendant was not required to submit the actual purchase orders to prove the existence of a contract between the parties.

It is true that Rule 1006 requires the proponent to "make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Fed. R. Evid. 1006. The record is unclear as to whether Essendant made the purchase orders available for APD's inspection. APD has raised no objection on this ground. It objects only that Essendant failed to produce any of the underlying documents *to the court*. *See, e.g.*, Resp. Br. at 14 ("Essendant has never provided to this Court the actual contract between itself and APD or the actual purchase orders."); *see also id*. at 15 ("Plaintiff has not produced any purchase orders for this Court's consideration."). However, Rule 1006 does not require that original documents be submitted to the court. The rule plainly states that the underlying documents must be produced to the court only if the court so orders. *See* Fed. R. Evid. 1006 ("And the court *may* order the proponent to produce [the originals or duplicates] in court.") (emphasis added); *United States v. Milkiewicz*, 470 F.3d 390, 396 (1st Cir. 2006) ("Under Rule 1006, the underlying documents must be made available to the other parties, and '[t]he court may order that they be produced in court.' The discretion accorded the trial court to order production of the documents means that the evidence underlying Rule 1006 summaries need not be introduced into evidence."). I have entered no such order here. Thus, even assuming that Essendant did not make the actual purchase orders available

to APD, any argument on this point has been forfeited because APD failed to raise it. *See, e.g.*, *Salas v. Wisconsin Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007) (a party forfeits any arguments it fails to raise in response to a motion for summary judgment).

Matters are slightly complicated by the fact that Essendant advanced its Rule 1006 argument only in its reply brief. As a result, APD did not have an opportunity to respond to the argument in the ordinary course of briefing. Since raising an argument for the first time in a reply brief typically results in forfeiture, *see, e.g.*, *Laborers' Pension Fund v. W.R. Weis Co.*, 879 F.3d 760, 768 n.6 (7th Cir. 2018), it might be argued that Essendant, not APD, has forfeited any argument in connection with Rule 1006.

Here, however, Essendant could not have raised the issue sooner because it invoked Rule 1006 only in rejoinder to APD's best-evidence objection, which APD raised only in its response brief. Under these circumstances, the usual forfeiture rule does not apply. *See, e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund v. White*, 258 F.3d 636, 640 (7th Cir. 2001) (appellant properly made argument for the first time in reply brief because it was prompted by arguments made in appellee's response brief); *Hammond, Kennedy, Whitney & Co. v. Honeywell Int'l, Inc.*, No. 16-CV-9808, 2018 WL 587182, at *2 (N.D. Ill. Jan. 29, 2018) ("Although a party raising an argument for the first time in a reply brief generally waives that argument, a reply brief may raise 'new' issues when responding to new arguments from the non-moving party's response brief.") (citations omitted).

As for APD, if it had wished to address Essendant's Rule 1006 argument, it could have sought leave to file a surreply. *See, e.g.*, *Cars R Us Sales & Rentals, Inc. v. Ford Motor Co.*, No. 08 C 50270, 2011 WL 1225468, at *1 (N.D. Ill. Mar. 31, 2011) ("While it

is generally true that arguments first raised in a reply brief are waived, here defendant was addressing evidence and arguments first raised by plaintiffs in their response.... Under this scenario, defendant's using the reply to challenge the supplemental opinion was reasonable. Plaintiff had ample time to seek leave to file a surreply to address defendant's attack on the supplemental report but did not do so.") (citation omitted). Alternatively, APD could have filed a motion under Federal Rule of Civil Procedure 56(d), which allows a nonmoving party to ask the court to deny or defer ruling on a motion for summary judgment if the party is unable to "present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). APD has not taken either of these steps, or given any other indication that it wishes to respond to Essendant's Rule 1006 argument.

In sum, given the large number of transactions at issue in the suit, Essendant was not required to provide the court with the actual purchase orders underlying its breach-of-contract claim. Accordingly, APD's best-evidence argument fails.

## 2. The Lack of Any Dispute Regarding the Facts Necessary to Establish the Contracts' Existence

There is a second reason why it was unnecessary for Essendant to submit the actual purchase orders to prove the existence of the contracts between the parties: APD has effectively conceded the point. "The elements of a contract are an offer, acceptance, and consideration." *BMO Harris Bank, N.A. v. Porter*, 106 N.E.3d 411, 421 (Ill. App. Ct. 2018). Under Illinois law, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." 810 ILCS 5/2-204; *see also* 810 ILCS 5/2-207(3) ("Conduct by both parties which recognizes the existence of a contract is

sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract.").

Here, APD admits that it repeatedly "submitted purchase orders for office products and merchandise through Plaintiff's electronic ordering system subject to the terms identified therein." Defs.' Resp. to Pl.'s L.R. 56.1 Stmt. ¶ 14. APD also admits that Essendant delivered all of the items that it ordered. This course of conduct is sufficient to prove the offer and acceptance elements of an enforceable contract. *See, e.g.*, *Jada Toys, Inc. v. Chicago Imp., Inc.*, No. 07 C 699, 2009 WL 3055370, at *6 (N.D. Ill. Sept. 18, 2009) ("Each order by Chicago Import to Jada constituted an offer to purchase goods. Jada's prompt shipment of the goods constituted acceptance of each offer."); *see also CA Acquisition, LLC v. Key Brands Int'l, Ltd.*, No. 15 C 5753, 2017 WL 2798393, at *3 (N.D. Ill. June 28, 2017) ("Chicago Aerosol has adduced ample evidence ... that Key Brands requested specific quantities of specific goods at specific prices, and that Chicago Aerosol shipped the requested goods in response. That is evidence that each purchase order formed a contract.") (citation omitted). And since there is no dispute that the parties' agreements were supported by consideration, the purchase orders constitute valid contracts.

Additionally, in its answer to Essendant's complaint, APD conceded that it owes Essendant a past-due amount for its purchases and that it disputes only the specific amount due. *See* Answer ¶¶ 14 ("For their response to paragraph 14 of the Complaint, APD and Mr. Kennedy admit that as of December 18, 2017, APD owed Plaintiff a past due amount, which amount is subject to dispute."); *see also id*. ¶ 17. APD could not owe

Essandant any amount unless the purchase orders constituted valid and enforceable contracts.[9]

Indeed, not only has APD admitted all of the facts necessary to establish that the purchase orders constitute binding contracts between the parties; it has also conceded all of the facts necessary to establish the remaining elements of Essandant's breach-of-contract claim. As previously noted, APD admits that Essandant delivered all of the goods that APD ordered, *see* Defs.' Resp. to Pl.'s L.R. 56.1 Stmt. ¶ 21, thereby establishing Essandant's performance; APD also admits that it has not made any payments to Essandant after December 21, 2017, *id.* ¶ 18, thereby establishing APD's breach; and there is no dispute that APD's failure to pay resulted in a financial loss to Essandant, thereby establishing the element of damages.

It is true that APD professes uncertainty as to the specific amount of Essandant's loss, which Essandant claims is $1,980,912.36. In response to Essandant's Local Rule 56.1 Statement, APD states that it is unable to admit or dispute this figure because it no longer has access to its electronic records system or its document retention service. According to Cy Kennedy, its data and documents were maintained by third-party vendors. When APD ceased doing business, he says, APD's contracts with the vendors were terminated and APD lost access to its records. *See* Cy Kennedy Aff. ¶¶ 11-12. Whatever the reason for its inability to dispute the amount it owes Essandant, APD has conceded the issue by failing properly to dispute it. *See, e.g.*, *Hartford Ins. Co. v. A.*

---

[9] Statements made by APD in its answer are binding for purposes of this motion. *See, e.g.*, *Crest Hill Land Dev., LLC v. City of Joliet*, 396 F.3d 801, 805 (7th Cir. 2005) ("The City's answer to paragraph 45 of the complaint ... constitutes a binding judicial admission. As such, it has the effect of withdrawing the question ... from contention ... for the purposes of summary judgment.") (citation omitted).

*Block Mktg., Inc.*, No. 04 C 5523, 2005 WL 1838447, at *2 (N.D. Ill. Aug. 2, 2005)

("Generally, stating that one does not have sufficient information to admit or deny a

Local Rule 56.1 statement of fact constitutes an admission of that fact.").[10]

In short, given that APD has conceded or otherwise failed to dispute all of the

facts necessary to establish Essendant's breach-of-contract claim, it was unnecessary

for Essendant to submit the actual purchase orders as evidence in support of the claim.

*See, e.g.*, *Inducol S.A. v. Gutierrez*, No. CIV. 12-2053 BJM, 2013 WL 5755362, at *2

(D.P.R. Oct. 23, 2013) (plaintiff was not required to include invoices as evidence in

support of motion for summary judgment where plaintiff instead submitted an accounts

receivable report and where defendant admitted that he owed the amounts on the

invoices); *Federated Retail Holdings, Inc. v. Sanidown, Inc.*, No. 06 CIV 6119 LTS THK,

2010 WL 5298113, at *11 (S.D.N.Y. Dec. 23, 2010) (defendant was not required to

enter actual contracts into evidence where it was undisputed that the parties had

---

[10] Once again, I note that APD has not asked for additional time to take discovery under Rule 56(d). Perhaps this is because APD believes that even with additional time, it would be unable to obtain access to its records from its vendors. Nevertheless, APD's apparent complacency about its inability to access its records is somewhat disconcerting. Cy Kennedy's affidavit does not reveal what efforts, if any, APD made to gain access to its records following the termination of its contracts with its vendors. While Cy says only that APD no longer has access to the material, he does not say that APD sought access and was denied. Also unclear is what efforts, if any, APD might have taken to preserve its access to its records prior to the termination of its contracts. Given that APD had stopped making payments in December 2017 while continuing to make purchases until April 2018, litigation with Essendant may well have been foreseeable before APD's contracts with its vendors were terminated. *See, e.g.*, *Peerless Indus., Inc. v. Crimson AV LLC*, No. 11 C 1768, 2014 WL 3497697, at *4 (N.D. Ill. July 14, 2014) ("The duty to preserve documents arises when a party has a reason to anticipate litigation.") (citing *Trask–Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008)). At all events, if APD's records are necessary for its defense, and APD no longer has any way of accessing the records, it is unclear how it might expect to present a defense at trial.

entered into contracts, that defendant supplied merchandise and sent invoices to plaintiffs pursuant to the contracts, and that plaintiffs had not paid the invoices in full); *Nissan Motor Acceptance Corp. v. Abbas Holding I, Inc.*, 976 N.E.2d 1076, 1082 (Ill. App. Ct. 2012) (plaintiff was not required to produce original guaranty agreement at trial where defendant's answer failed to dispute that he had signed and delivered agreement to plaintiff and failed to dispute that document attached to complaint was an accurate copy of the guaranty); *cf. Quintanilla v. Suffolk Paving Corp.*, No. CV 09-5331 (AKT), 2019 WL 885933, at *34 (E.D.N.Y. Feb. 22, 2019) (the fact that contracts were not part of the record did not defeat plaintiffs' wage-violation claims because the relevant portions of the contract were undisputed).

For these reasons, I am unconvinced by APD's contention that Essendant has failed to provide sufficient evidence that contracts existed between the parties.

### 3. APD's Miscellaneous Contentions

In addition to its best-evidence objection, APD asserts two other arguments in response to Essendant's breach-of-contract claim. These are less developed than the best-evidence argument and can be addressed in short order.

First, APD contends that Essendant has failed to establish the terms of the purchase orders. Specifically, APD claims that Essendant has not "established Defendant's time for performance or any conditions that would trigger performance." Defs.' Resp. Br. at 13. According to APD, this is because the payment date for its purchases varied between 30, 60, and 90 days, depending on the number of goods purchased and the time for delivery.

Yet APD fails to explain why it believes this undermines Essendant's breach-of-contract claim. APD does not contend that the differing payment dates render the purchase orders' terms uncertain, making the agreements invalid or unenforceable. Moreover, regardless of whether payment for the purchases was due 30, 60, or 90 days from delivery, there is no dispute that by this point, payment is well past due for all of APD's purchases. As noted above, APD placed its final order from Essendant on April 6, 2018, *see* Defs.' Resp. to Pl.'s L.R. 56.1 ¶ 19, and neither APD nor the Kennedys have made any payments to Essendant since December 2017, *id*. ¶ 18.

Second, APD raises various objections in connection with Anthony Giuliano's affidavit. In particular, APD complains that there is no evidence that Giuliano "*participated* in the formation of the contract either by negotiating its terms or performing on its obligations." Defs.' Resp. Br. at 15. As a result, APD argues, Essendant "seeks to prove the terms of the contract by having Guiliano [sic] testify about the contents of a writing he has never seen." *Id*. Further, APD complains that the account ledger attached as an exhibit to Giuliano's affidavit consists of "undecipherable information" and that it "does not include the name APD nor a signature by any officer or employee of APD." *Id*. at 14.

Again, APD fails to articulate in precisely what way it believes any of these facts undermines Essendant's breach-of-contract claim. For one thing, APD cites no authority suggesting that a witness is barred from testifying about the terms of a contract unless he or she has participated in the contract's formation or performance. More fundamentally, APD appears to misapprehend the purpose of Giuliano's affidavit. Essendant does not offer Giuliano's testimony to establish the specific terms for each of

the purchase orders. Rather, his affidavit is offered primarily to lay the foundation for the account ledger and to substantiate Essendant's calculation of APD's indebtedness. Further, despite APD's assertion to the contrary, the account ledger is not "undecipherable." The document details the date on which each order was placed, the amount of each order, and the payment due date. And while the ledger does not specifically identify APD as the party placing the orders, Giuliano's affidavit makes clear that the purchases listed were made by APD. *See* Giuliano Aff. ¶ 14. Finally, although it is true that the ledger has not been signed by an APD representative, APD offers no reason to think that it should have been. The ledger does not purport to be a contract between the parties; it merely summarizes the transactions relevant to Essendant's breach-of-contract claim.

In sum, Essendant has established that the purchase orders submitted by APD constitute enforceable contracts between the parties and that APD breached the agreements by failing to pay for the purchases. Further, the record shows that Essendant has suffered damages in the amount of $1,980,912.36 as a consequence of APD's breach. Accordingly, Essendant is entitled to summary judgment on its breach-of-contract claim against APD.

## C. Breach of Contract as to the Kennedys

Finally, I turn to Essendant's breach-of-contract claim against the Kennedys based on their failure to pay APD's outstanding debt in accordance with the terms of the Guaranty. Under Illinois law, "[a] guaranty is a contract and is therefore examined under general principles of contract law." *PNC Bank, Nat. Ass'n v. Dubin*, No. 11 C 2126, 2012 WL 28766, at *2 (N.D. Ill. Jan. 5, 2012) (citing *Bank of Am. Nat'l Trust & Sav. Ass'n v.*

*Schulson*, 714 N.E.2d 20, 24 (Ill. App. Ct. 1999)). Thus, as with any contract, to be valid, a guaranty "must contain offer, acceptance, and consideration," and "to be enforceable, the agreement must also be sufficiently definite so that its terms are reasonably certain and able to be determined." *DiLorenzo v. Valve & Primer Corp.*, 807 N.E.2d 673, 678 (Ill. App. Ct. 2004) (quotation marks omitted).[11] Like APD, the Kennedys challenge only the first element of the breach-of-contract claim. They contend that the Guaranty is unenforceable because it "does not contain sufficient terms to establish the parties' meeting of the minds." Defs.' Resp. Br. at 12. The Kennedys' arguments on this point are unconvincing.

"The principles of contract state that in order for a valid contract to be formed, an offer must be so definite as to its material terms or require such definite terms in the acceptance that the promises and performances to be rendered by each party are reasonably certain." *Acad. Chicago Publishers v. Cheever*, 578 N.E.2d 981, 983 (Ill. 1991) (quotation marks omitted). It is well settled that a "contract may be enforced even though some contract terms may be missing or left to be agreed upon." *Id.* at 984. It is only when "the essential terms are so uncertain that there is no basis for deciding

---

[11] I am mindful that Illinois law separately recognizes a cause of action for breach of guaranty. *See, e.g.*, *Bank of Montreal v. SK Foods, LLC*, No. 09 C 3479, 2010 WL 3385534, at *3 (N.D. Ill. Aug. 19, 2010); *Gen. Elec. Bus. Fin. Servs., Inc. v. Silverman*, 693 F. Supp. 2d 796, 799 (N.D. Ill. 2010). However, "[w]hile breach of guaranty and breach of contract claims have different elements, they are closely aligned," and "[w]here a breach of guaranty is crafted ... as a breach of contract, the court construes the claim according to breach of contract principles." *TCFIF Inventory Fin., Inc. v. Appliance Distributors, Inc.*, No. 12 C 332, 2014 WL 806961, at *6 (N.D. Ill. Feb. 28, 2014) (quotation marks omitted). Because both parties have treated Essendant's claim against the Kennedys as one for breach-of-contract, I have likewise treated it as such. However, in view of the similarity between breach-of-contract and breach-of-guaranty claims, Essendant would be entitled to summary judgment on its claim against the Kennedys regardless of how the claim is styled.

whether the agreement has been kept or broken, [that] there is no contract." *Id*. at 984. In other words, a "contract 'is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do.'" *Id*. at 983 (quoting *Morey v. Hoffman*, 145 N.E.2d 644 (Ill. 1957)).

The Kennedys maintain that the Guaranty is indefinite in only two respects. The first of these is the extent of their responsibility for APD's debts. The Kennedys observe that the Guaranty does not refer to any purchase order, does not specify a particular balance owed to Essendant, and does not list any minimum or maximum amount of credit that would be extended to APD. While the Guaranty is indefinite in these respects, however, it is clear about the overall extent of the Kennedys' responsibility: the document states that their obligation is "absolute and unconditional." Guaranty ¶ 1. The Guaranty's lack of specificity regarding purchase orders, balances, and credit limits is largely a function of the nature of the agreement. For example, because the Guaranty's purpose was to allow APD to continue making purchases in the future, the specific amount for which the Kennedys might ultimately be responsible could not have been specified *ex ante*. The Kennedys fail to advance any argument or cite any case suggesting that a contract cannot be enforceable if it does not specify these terms.

The other indefinite term cited by the Kennedys has to do with the time for performance under the Guaranty. The Kennedys point out that instead of identifying a particular date by which they are required to pay APD's indebtedness, the Guaranty requires only that payment be "prompt." *See* Guaranty at 1 ("[T]he undersigned (jointly and severally if more than one) hereby unconditionally guarantees to Creditor, its

successors and assigns, the prompt payment of any and all indebtedness now due and/or which may hereafter become due to Creditor."). As a result, they assert, "there is no meaningful way to determine when the time for the Kennedys' performance is due or how long they have to perform." Defs.' Resp. Br. at 13 (emphasis omitted).

This argument lacks merit. Terms requiring "prompt payment" are frequently included in contracts. *See, e.g.*, *Florsheim Grp., Inc. v. Cruz*, No. 00 C 2204, 2001 WL 1134856, at *1 (N.D. Ill. Sept. 25, 2001) ("[Guarantor] absolutely and unconditionally guarantee[s] the full and prompt payment to Florsheim, its successors or assigns, of any and all present and future indebtedness, liabilities and obligations, whether primary or secondary, direct or indirect or secured or unsecured, including interest and service charges, of [Miami Shoes] to Florsheim."); *Pink Fox, LLC v. Sing Chok Kwok*, 2016 IL App (1st) 150868-U (guaranty included a clause requiring guarantors to make "full and prompt payment of Rent and any and all other sums and charges payable by the Tenants" in the event of a default by tenant); *Dika-Homewood, L.L.C. v. Homewood Square Cleaners*, 2014 IL App (1st) 130275-U, ¶ 11 (absolute and unconditional guaranty requiring "the full and prompt payment of Rent and Additional Rent, including, but not limited to, the Minimum Rent, common Area Charges, Insurance Payments, Real Estate Taxes, Utility Charges, and other sums").

In fact, it is difficult to find any Illinois case in which a term requiring "prompt payment" has been challenged for lack of definiteness. One court addressed the issue in dictum and opined that the term was not ambiguous or uncertain. *See, e.g.*, *Roels v. Drew Indus., Inc.*, 608 N.E.2d 411, 415 (Ill. App. Ct. 1992) ("The language of the guaranty is not ambiguous or uncertain. It provides that defendant 'guarantee the full

and prompt payment and performance of all obligations of the company contained in the foregoing employment agreement for the term thereof.'"). The Restatement of Contracts likewise states unequivocally that a term requiring prompt performance is definite enough to establish a binding contract. *See* Restatement (Second) of Contracts § 33 (1981) illus. 1 ("A and B promise that certain performances shall be mutually rendered by them 'immediately' or 'at once,' or 'promptly'.... All these promises are sufficiently definite to form contracts.").

Although the Kennedys cite several cases that purportedly support their position, none of these is on point. In C*ountry Club Estates Condominium Ass'n v. Bayview Loan Servicing LLC*, 84 N.E.3d 1140 (Ill. App. Ct. 2017), for example, the question presented was whether the defendant had made "prompt payment" of post-sale assessments after purchasing a condominium at a foreclosure sale, thereby extinguishing its liability for pre-sale assessments under section 9(g)(3) of the Condominium Property Act, 765 ILCS 605/9(g)(3). The court held that whether the defendant's payment had been "prompt" was a question of fact that precluded summary judgment. Here, however, the dispute involves a contract, not a statute. *See, e.g.*, 5 Corbin on Contracts § 24.2 (2019) ("Although the courts do not employ a uniform approach to statutory interpretation, the task of interpreting legislation usually differs from that of interpreting a contract."). Moreover, unlike in *Country Club Estates*, the Kennedys do not argue that a factual dispute exists as to whether they made "prompt payment" within the meaning of the Guaranty. (To date, they have not made any payment). Rather, the Kennedys maintain that summary judgment must be denied because, given the "prompt payment" term's indefiniteness, the Guaranty is *unenforceable*.

*Champaign National Bank v. Landers Seed Co*., 519 N.E.2d 957 (Ill. App. Ct. 1988), is also wide of the mark. At issue there was a bank's alleged oral agreement to continue financing the defendant's business "as long as there was progress towards profitability and a chance at profitability." *Id*. The court reasoned that it was impossible to determine whether these conditions had been satisfied, and concluded that there was no enforceable agreement as a matter of law because "the so-called contract did not contemplate the terms of future loans or refinancing of existing loans." *Id*. at 961.

The Kennedys cite *Champaign National* for the proposition "that 'when there is no basis for deciding whether the agreement has been kept or broken, there is no contract.'" Defs.' Resp. Br. at 13 (quoting *Champaign National*, 519 S.E. 2d at 960). Their contention appears to be that the Guaranty is unenforceable because its "prompt payment" requirement is as indefinite as the terms "progress towards profitability" or a "chance at profitability" in *Champaign National*. But the analogy between these terms is inapt, and the Kennedys make no attempt to explain or support it, or even to expressly articulate it.

A third and final case cited by the Kennedys is *Echo, Inc. v. Whitson Co*., 121 F.3d 1099 (7th Cir. 1997). *Echo* involved a dispute over the meaning of two specific contractual provisions: the first provided that the agreement would automatically renew each year on November 30, unless notice of termination was given at least sixty days prior to termination, *id*. at 1055; the second provision enumerated several events that could result in immediate termination and stated that each party could terminate "'with or without cause' upon a minimum of 60 days advance written notice." *Id*. The defendant argued that the agreement could be terminated only on November 30 and

only after giving sixty days' notice. The plaintiff argued that either party could terminate the agreement at any time during the year so long as it gave sixty days' notice. *Id*. The court concluded that the two clauses rendered the contract ambiguous and that the question of when the contract was terminable was one for the jury.

As with *Champaign National*, the Kennedys do not explain in precisely what respect they believe *Echo* is relevant to this case. They characterize the case as holding that a "contract with an indefinite duration was ambiguous." Defs.' Resp. Br. at 13. This is mistaken in several ways, however. First, the court did not hold that the contract was ambiguous because its duration was indefinite; it held that the contract was ambiguous as to whether its duration was in fact indefinite or whether it was terminable at any time with sixty days' notice. Second, *Echo* did not hold that the contract's ambiguity rendered the parties' agreement *unenforceable*. As in *Country Club Estates*, the court held only that the ambiguity raised a question for the jury. Nor does anything in *Echo* suggest that contracts of indefinite duration are necessarily invalid or unenforceable. On the contrary, the court expressly stated that "[a] written agreement may specify that it has an indefinite duration." *Id.* at 1105 (citing *Jespersen v. Minnesota Mining and Mfg. Co.*, 681 N.E.2d 67, 70 (Ill. App. Ct. 1997)). At all events, the Guaranty's duration is not indefinite. It terminates once APD's indebtedness has been paid.

In short, the Kennedys have failed to show any respect in which the Guaranty is unenforceable on account of its indefiniteness. Hence, because the Guaranty is an enforceable agreement, and because it is undisputed that the Kennedys have failed to

perform their obligations in accordance with the agreement, Essendant is entitled to summary judgment on its breach-of-contract claim against the Kennedys.

## D.     Prejudgment Interest

In addition to seeking summary judgment on its breach-of-contract claims against the defendants, Essendant also requests an award of prejudgment interest on the amount of APD's unpaid balance. "In diversity cases governed by *Erie*, federal courts look to state law to determine the availability of (and rules for computing) prejudgment interest." *Matter of Oil Spill by Amoco Cadiz Off Coast of France on Mar. 16, 1978*, 954 F.2d 1279, 1333 (7th Cir. 1992). "The basic purpose of prejudgment interest is to put a party in the position it would have been in had it been paid immediately. It is designed to ensure that a party is fully compensated for its loss." *Am. Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 935 (7th Cir. 2003).

"As a general rule, prejudgment interest is recoverable only where authorized by the agreement of the parties or by statute." *Kouzoukas v. Ret. Bd. of Policemen's Annuity & Benefit Fund of City of Chicago*, 917 N.E.2d 999, 1015 (Ill. 2009). Essendant does not contend that it is entitled to prejudgment interest by virtue of any agreement between the parties. Instead, Essendant relies on the Illinois Interest Act, 815 ILCS 205/0.01 *et seq*. Section 2 of the statute provides:

> Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance; on money received to the use of another and retained without the owner's knowledge; and on money withheld by an unreasonable and vexatious

delay of payment.

815 ILCS 205/2.

According to Essendant, it is entitled to prejudgment interest because the defendants' debt is based on "instruments of writing" within the meaning of the Act (i.e., the purchase orders and the Guaranty). *See* Pl.'s Mem. Supp. Summ. J. at 5. Additionally, Essendant argues that it is entitled to prejudgment interest because the defendants have made no payments since December 2017, constituting a "vexatious delay" for purposes of the statute. *Id.*

The defendants do not address the issue of prejudgment interest in their response brief. And although they acknowledge the issue in their response to Essendant's Local Rule 56.1 Statement, they merely deny Essendant's entitlement to prejudgment interest without offering any basis for the denial. *See id.* ¶¶ 28-30. The defendants also assert that Essendant's statements regarding prejudgment interest are not statements of material fact – again, however, without explanation. *Id.* Accordingly, Essendant's statements concerning prejudgment interest are deemed admitted and any contention that Essendant is not entitled to prejudgment interest has been forfeited. *See, e.g.*, *Salas*, 493 F.3d at 924 (party forfeits arguments it fails to raise in response to motion for summary judgment); *Lumpkins-Benford v. Allstate Ins. Co.*, 987 F. Supp. 2d 807, 812 (N.D. Ill. 2013) ("[S]everal of Plaintiff's responses to Defendant's facts are not denials supported by the record, but rather conclusory assertions, conjecture, additional facts, or argumentative denials without citations to specific evidentiary materials. The consequence of Plaintiff's failure to satisfy Local Rule 56.1 in her responses is that the

factual allegations she improperly responded to are deemed admitted"). I therefore grant Essendant's request for prejudgment interest.

In its brief, Essendant seeks prejudgment interest in the amount of $75,757.47. That figure is based on the number of days between June 6, 2018 (30 days after the payment for APD's final purchase was due) and March 13, 2018 (the date on which the summary-judgment motion was filed). Essendant explains its calculations as follows: as of June 6, 2018, APD's outstanding balance was $1,982,462.36. However, on January 22, 2019, Essendant issued APD a credit, which reduced the balance to $1,980,912.36. Thus, for the period from June 6, 2018 to January 21, 2019, Essendant seeks prejudgment interest of $62,189.57 (5% x $1,982,462.36 = $271.57 per day; $271.57 x 229 days = $62,189.57); and for the period from January 22, 2019 to March 13, 2019, the prejudgment interest comes to $13,567.89 (5% x $1,980,912.36 = $271.36 per day; $271.36 x 50 days = $13,567.89). Thus, the total amount of prejudgment interest calculated in the motion is $62,189.57 + $13,567.89 or $75,757.47.

However, Essendant also seeks prejudgment interest for the period up to the entry of judgment -- i.e., from March 14, 2019 to September 27, 2019. This period amounts to 197 days, which adds up to an additional $53,457.92 ($271.36 x 197). Hence, the grand total for the amount of prejudgment interest to which Essendant is entitled is $129,215.39 ($75,757.47 + $53,457.92).

### III.

For the reasons discussed above, Essendant's motion for summary judgment is granted. Judgment is entered against APD in the amount of $1,980,912.36 plus

prejudgment interest of $129,215.39. Judgment is likewise entered against Ray and Cynthia Kennedy in the same amount.

As Essendant notes, the Guaranty provides for the recovery of attorneys' fees from the Kennedys. *See* Guaranty ¶ 4 ("The undersigned hereby agrees to pay Creditor all costs and expenses, including reasonable attorney's fees, which Creditor may incur in attempting to collect the Indebtedness, or any part thereof, and/or in enforcing this Guaranty against such undersigned and that such amounts shall be added to the Indebtedness."). Hence, Essendant may file a petition to prove up its attorneys' fees.

**Elaine E. Bucklo**

United States District Judge

Dated: September 27, 2019